IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 1:20-cv-00618-RBJ

LATARSHA FLORES and
SAMUEL JACKSON, individually and as Representatives of the Estate of Shamikle Jackson,
and as Next Friends of N.J., Successor in Interest,

      Plaintiffs,

v.

CITY OF AURORA, a municipality,
BRIDGET JOHNSON, individually,
JUSTIN HENDERSON, individually,
KEITH MATTHEWS, individually,
TONEY HANNON, individually, and
CLARK ORCHARD, individually,

      Defendants.

---

## ORDER ON DEFENDANTS' MOTION TO DISMISS

---

      This case involves the killing of Mr. Shamikle Jackson by Aurora police officers. Before the Court is defendants' motion to dismiss Plaintiffs' First Amended Complaint pursuant to Fed.R.Civ.P. 12 (b)(6) and 12 (b)(1). ECF No. 35. For the reasons discussed below, defendants' motion is GRANTED IN PART and DENIED IN PART.

## I. FACTUAL BACKGROUND

      The following facts are taken from plaintiffs' amended complaint, ECF No. 28, and are assumed to be true for purposes of the motion to dismiss. Shamikle Jackson ("Mr. Jackson"), the decedent in this case, was a resident of Colorado at the time of his death. He was twenty-two

years old.  *Id.* at ¶ 89.  He lived with his sister Shaquayla Jackson ("Ms. Jackson") and her minor

child in Aurora at 2210 N. Dallas Street, Apt #2.  *Id.* at ¶¶ 9, 11.  Mr. Jackson spent time with

and financially supported his minor daughter, Nova Jackson, who lived in Louisiana.  *Id.* at ¶ 10.

Latarsha Flores and Samuel Jackson ("plaintiffs") are Mr. Jackson's parents.  They resided in

Louisiana at all relevant times.  *Id.* at ¶¶ 12–14.  Bridget Johnson, Justin Henderson, Keith

Matthews, Toney Hannon, and Clark Orchard ("individual defendants") were police officers

with the Aurora Police Department ("APD") at the time of these events.  *Id.* at ¶¶ 15–19.

On March 4, 2019 at 8:50 am Mr. Jackson called 911 on his sister's cell phone while

experiencing a mental health crisis.  About a week before his call, he had been seen at Aurora

Mental Health for evaluation and treatment—a fact known to his sister and other family

members.  *Id.* at ¶¶ 24–26.  During the six-minute 911 call Mr. Jackson told the dispatcher that

he had two hostages, and that two people were dead.  *Id.* at ¶ 28.  It is not clear what else was

said or occurred during the call, except that the dispatcher did not gather additional information

from Mr. Jackson about any potential mental health disabilities or emotional disturbances.  *Id.* at

¶ 29.

Officers Johnson, Matthews, Hannon, and Orchard were dispatched to the scene at

approximately 8:53 am, and Officer Henderson decided himself to respond to the call.  *Id.* at ¶¶

34–36.  No Crisis Response Team or Crisis Intervention Trained Members were dispatched.  *Id.*

at ¶ 32.  Officers Matthews and Orchard each said that they responded to a call referencing a

possible hostage situation and two people possibly deceased.  Officer Orchards also said during

his post-incident interview that he thought the 911 call was some sort of prank, as APD had

received those recently.  *Id.* at ¶¶ 37–39.

Upon arriving at the scene, the officers proceeded directly to apartment #2.  No one else appeared to be around.  The front door to the apartment was slightly open, and the officers announced their presence.  *Id.* at ¶¶ 40–44.  Ms. Jackson came to the door.  The officers asked if there was anyone else inside the apartment, and Ms. Jackson said that she and her brother Shamikle Jackson were the only ones.  *Id.* at ¶¶ 45–47.  Ms. Jackson was removed from the entryway and questioned one-on-one by Officer Johnson.  Ms. Jackson told Officer Johnson that her brother had possible mental health issues.  *Id.* at ¶¶ 50–51.  Officer Johnson radioed the other officers informing them that Ms. Jackson reported that her brother was alone in the apartment, had mental health issues, and was unarmed.  ECF No. 38-1 at 2:46.

Assuming the truth of the factual allegations, Officers Henderson, Matthews, Hannon, and Orchard entered the apartment knowing that Mr. Jackson was alone and posing no danger to others.  ECF No 28 at ¶¶47–49, 111–12.  They did not discover any hostages or injured persons there.  *Id* at ¶¶ 64–65.  They went down a long, narrow, dark hallway yelling commands.  Officer Henderson had his gun drawn, and other officers may have had weapons drawn as well.  *Id.* at ¶¶ 67–69.  Once officers entered the apartment, "things escalated quickly."  *Id.* at ¶ 76.  The situation reached a point where police had to use deadly force.  *Id.* at 77.  Officer Matthews tased Mr. Jackson.  *Id.* at ¶ 77.  Officer Henderson shot Mr. Jackson multiple times, killing him, within a few minutes of officers' responding to the call.  *Id.* at ¶ 71.

## II. PROCEDURAL BACKGROUND

Plaintiffs filed this lawsuit on March 4, 2020, ECF No. 1, and they filed an amended complaint on August 28, 2020.  On behalf of the Estate and Successor in Interest of Shamikle Jackson, they bring a claim for excessive force against all defendants and claims for wrongful

death and assault and battery against the individual defendants.  ECF No. 28.  Defendants moved

to dismiss the case on November 16, 2020.  ECF No. 35.  Plaintiffs responded in December

2020, and defendants replied in January 2021.  ECF Nos. 38, 39.  The motion is ripe for review.

### III. STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "enough facts

to state a claim to relief that is plausible on its face."  *Ridge at Red Hawk, L.L.C. v. Schneider*,

493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

570 (2007)).  A plausible claim is a claim that "allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009).  While the Court must accept the well-pled allegations of the complaint as true and

construe them in the light most favorable to the plaintiff, *Robbins v. Wilkie*, 300 F.3d 1208, 1210

(10th Cir. 2002), conclusory allegations are not entitled to a presumption of truth.  *Iqbal*, 556

U.S. at 681.  However, the plaintiff meets the threshold pleading standard so long as he or she

offers sufficient factual allegations such that the right to relief is raised above the speculative

level.  *See, e.g.*, *Twombly*, 550 U.S. at 556; *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir.

2008).  For purposes of this motion, I assume all of plaintiffs' factual allegations to be true and

draw all reasonable inferences in plaintiffs' favor.

### IV. ANALYSIS

#### A.  <u>Consideration of materials outside the pleadings</u>

Generally, a court ruling on a Rule 12(b)(6) motion may consider only the contents of the

complaint.  *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).  A court may, however,

consider additional documents that are attached to the complaint or incorporated by reference

into the complaint. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).  A court may also consider indisputably authentic documents that are both referred to in the complaint and central to the plaintiff's claim.  *Id.*; *see also Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017).

Defendants ask the Court to consider three pieces of evidence submitted alongside their motion to dismiss: a recording of the 911 call and footage from both Officer Johnson's and Officer Henderson's body worn cameras ("BWCs").  ECF No. 35-A; 35-B; ECF No. 39-C. They claim these audio/visual exhibits were referenced in the complaint and are central to plaintiffs' claim.  ECF No. 39 at 2 n.2.  Plaintiffs object to inclusion of the video and audio evidence, ECF No. 38 at 3, but they include a transcript of Officer Johnson's BWC footage for the court's consideration, ECF No. 38-1.

At this stage the Court will not consider audio of the 911 call or footage from Officer Henderson's BWC.  Plaintiffs reference the events depicted by the audio recording of the 911 call and the video recording from Officer Henderson's BWC.  They do not reference the recordings themselves.  The distinction between referencing events and referencing recordings becomes apparent when plaintiff's complaint is compared to the complaint in the primary authority cited by defendants, *Pittman v. City of Aurora*, No. 19-CV-01947-PAB-NRN, 2020 WL 6586659 (D. Colo. Oct. 23, 2020).  *See* ECF No. 39 at 2 n.2.  The *Pittman* court found that a complaint had referred to BWC footage by alleging that "[t]he officers' lapel cameras clearly show that Mr. Pittman felt threatened," and "Lieutenant Cerinich could clearly see and hear on the body camera footage that Mr. Pittman was unlawfully seized."  *Pittman*, 2020 WL 6586659 at *4 (quoting Second Amended Complaint at ¶¶65, 71, *Pittman*, 2020 WL 6586659 (No. 19-

CV-01947-PAB-NRN)).  By contrast, plaintiffs' complaint in this case makes no explicit reference to any video or audio recording.  That plaintiffs describe events that were captured by video/audio recordings does not mean that plaintiffs referred to the recordings themselves.

The Court will, however, consider the footage and transcript from Officer Johnson's BWC.  Even if the footage itself is not referenced, plaintiffs invite the Court to consider the footage by attaching and citing a transcript of the footage.  *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) ("Because . . . all the parties invited the district court to consider [a piece of evidence], the district court properly considered the [evidence] in ruling on the 12(b)(6) motion.").  Plaintiffs' reliance on the transcript shows that they are "obviously on notice" of the video's contents, so any rationale for excluding the footage "dissipates."  *GFF Corp.*, 130 F.3d at 1385.

## B.  Section 1983

Title "42 U.S.C. § 1983 allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law."  *Cillo v. City of Greenwood Village*, 739 F.3d 451, 459 (10th Cir.2013).

This Court may choose to assess liability of officers under §1983 either individually or collectively.  *Estate of Booker v. Gomez*, 745 F.3d 405, 412 (10th Cir. 2014).  Plaintiffs claim Officer Henderson is liable under §1983 for shooting and killing Mr. Jackson.  ECF No. 28 at ¶128.  Plaintiffs claim Officers Johnson, Matthews, Hannon, and Orchard (collectively the "other officers") are liable under §1983 for failing to intervene.  *Id.* at ¶ 129.  This order assesses first whether plaintiffs have stated a claim under which Officer Henderson may be found liable and then conducts a similar analysis for the other officers.

1. <u>Officer Liability — Officer Henderson</u>

Defendants argue that plaintiffs failed to state a viable §1983 claim because Officer Henderson is entitled to qualified immunity.  ECF No. 35 at 6.  Qualified immunity protects government officials acting in their individual capacities so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Determining whether an official is entitled to qualified immunity is typically a two-step inquiry.  *Id.*; *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Court must ask (1) whether plaintiff has sufficiently demonstrated that a constitutional violation occurred; and (2) whether the constitutional right at issue was clearly established at the time of the incident.  *Pearson*, 555 U.S. at 232.

Defendants set a higher bar for themselves by asserting a qualified immunity defense in a Rule 12(b)(6) motion instead of using the more common the Rule 56 vehicle.  *See Peterson v. Jensen*, 371 F.3d 1999, 1202 (10th Cir. 2004).  In the 12(b)(6) context, "a district court should not dismiss a complaint 'for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  *Id.* (quoting *Currier v. Doran*, 242 F.3d 905, 917 (10th Cir. 2001)).

a. <u>Qualified Immunity: Constitutional Violation</u>

This Court first determines whether a constitutional violation occurred.  *See Pearson*, 555 U.S. at 232.  Plaintiffs contend that Officer Henderson violated Mr. Jackson's Fourth Amendment rights by unreasonably seizing him after wrongfully provoking the need to use deadly force.  ECF No. 28 at ¶¶ 105, 108.  Defendants respond that the use of force was

reasonable under the Fourth Amendment.  ECF No. 35 at 6–7.  They further contend that Officer

Henderson's actions leading up to his fatally shooting Mr. Jackson are irrelevant because deadly

force may be reasonable even when an officer intentionally or recklessly provokes violent

conduct.  ECF No. 35 at 7.

"*[A]ll* claims that law enforcement officers have used excessive force . . . should be

analyzed under the Fourth Amendment and its 'reasonableness' standard.  *Graham v. Connor*,

490 U.S. 386, 395 (1989).  Courts must balance "the nature and quality of the intrusion on the

individual's Fourth Amendment interests against the countervailing governmental interests at

stake."  *Id*. At 396 (citation and internal quotation marks omitted).  *Graham* established three

factors for courts to consider: (1) the severity of the crime for which the suspect was seized, (2)

whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether

the suspect was actively resisting arrest or attempting to evade arrest by fleeing.  *Id*.  Whether a

particular use of force was reasonable "must be judged from the perspective of a reasonable

officer on the scene, rather than with the 20/20 vision of hindsight."  *Id*.

The first *Graham* factor, "the severity of the crime at issue," *id*. at 396, weighs in

plaintiff's favor.  Accepting plaintiffs' allegations, but also the Johnson BWC transcript, Officer

Henderson approached the apartment knowing that Mr. Jackson was alone in the apartment,

posed no danger to anyone inside or outside the premises, and had mental health issues.  ECF

No. 38-1 at 1-2.  ¶111–12.  The record supports this factual claim about Officer Henderson's

knowledge — plaintiff alleges that at least one officer believed the 911 call was a prank, ECF

No. 28 at ¶39, that Ms. Jackson informed officers that her brother was alone inside the

apartment, ECF No. 28 at ¶47, and that Officer Johnson told the other officers that Mr. Jackson

was alone, without weapons, and with mental health issues, ECF No. 28-1 at 2:46.  If Officer

Henderson knew that Mr. Jackson was alone and probably did not have weapons, then the "crime

at issue" would only have been false reporting of an emergency to authorities, a class 3

misdemeanor.  COLO. REV. STAT. §18-8-111 (2018).  When the severity of the crime is a

misdemeanor, "[the first *Graham*] factor weighs against an officer's use of force."  *Bond v. City*

*of Tahlequah, Okla.*, 981 F.3d 808, 819 (10th Cir. 2020).

The second *Graham* factor, "whether the suspect pose[ed] an immediate threat to the

safety of the officers or others," 490 U.S. at 396, is the most important.  *Pauly v. White*, 874 F.3d

1197, 1216 (10th Cir. 2017).  If, as defendants contend, Mr. Jackson was advancing toward

Officer Henderson with a machete at the time of the shooting, then Officer Henderson would

have been acting in self-defense in the instant he shot Mr. Jackson.  The shooting viewed in

isolation would therefore have been objectively reasonable under the Fourth Amendment.  But

that would require the Court to consider materials outside of, and contrary to, the facts alleged in

the Amended Complaint and the Johnson BWC footage.

Plaintiffs concede that once the situation inside the apartment had already escalated,

"[n]o force could reasonably have been used to get the situation under control rather than

deployment of multiple gunshots and a taser."  ECF No. 28 at ¶78.  They argue, however, that

Officer Henderson's "reckless" and "unreasonable conduct immediately preceding the shooting

wrongfully provoked the need for deadly force."  ECF No. 28 at ¶107–08.

The Tenth Circuit recognizes that "[t]he reasonableness of the use of force depends not

only on whether the officers were in danger at the precise moment that they used force, but also

on whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably

'created the need to use such force.'" *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir.

2004) (quoting *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995).  An officer's

conduct "immediately connected" to the suspect's threat of force will render the officer's use of

force unreasonable if the officer acted recklessly.  *Pauly*, 874 F.3d at 1220–21 (citing *Allen v.

City. of Muskogee, Okla.*, 119 F.3d 837 (10th Cir. 1997)).

Defendants ask the Court to disregard this precedent, claiming that the Supreme Court's

2017 decision in *City of Los Angeles, California v. Mendez*, 137 S. Ct. 1539, 1546 (2017)

precludes §1983 liability even when officers intentionally or recklessly provoke violent conduct.

Defendants misread *Mendez*.  That case prohibited "conflat[ing] distinct Fourth Amendment

claims."  *Id.* at 1547.  The Court held that the Ninth Circuit had improperly assigned §1983

liability for a reasonable seizure on the basis of a separate and distinct unreasonable search.  *See

id*. at 1543–44.  *Mendez* explicitly "decline[d] to address" whether, under *Graham* itself, the use

of force can be excessive when "unreasonable police conduct prior to the use of force . . .

foreseeably created the need to use it."  *Id.* at 1547 n.*.

The Tenth Circuit has repeatedly reaffirmed that *Mendez* did not displace the

longstanding practice of considering prior police conduct when assessing the reasonableness of

police use of force.  *See Cox v. Wilson,* 971 F.3d 1159, 1170 (10th Cir. 2020), *accord Pauly*, 874

F.3d at 1219.  This Court is obligated to assess "whether the totality of the circumstances

justifie[s] a particular sort of search or seizure."  *Mendez*, 137 S. Ct. at 1546 (quoting *Tennessee

v. Garner*, 471 U.S. 1, 9 (1985)).  Disregarding Officer Henderson's conduct before the shooting,

as defendants request, would violate our obligation.

I conclude that plaintiffs sufficiently alleged reckless conduct by Officer Henderson that precipitated his use of force against Mr. Jackson.  Accepting plaintiff's factual allegations, this is a situation where Officer Henderson forcefully entered an apartment that he knew contained only a single individual undergoing a mental health crisis so severe that the disturbed individual phoned in a 911 emergency that a fellow officer later admitted that he thought was a prank Despite knowing that Mr. Jackson "did not pose a danger to anyone" because he was alone in that apartment and "the immediate vicinity to the apartment was clear of all individuals," ECF No. 28 at 111–12, Officer Henderson "proceed[ed] down a long, narrow and dark hallway with deadly weapon[s] drawn" and "corner[ed]" Mr. Jackson, ECF No. 28 at ¶70.  Fewer than two minutes passed between when officers first called Mr. Jackson's name and when Officer Henderson shot and killed him.  *See* ECF No.28-1 at 1:39, 3:30.  Officer Henderson's use of force was thus immediately connected to his entering the apartment with weapons drawn.  *See Pauly*, 874 F.3d at 1205, (finding that police shooting at a suspect less than five minutes after arriving on the scene was "immediately connected" to prior police conduct); *Allen*, 119 F.3d at 841 (finding the same for a ninety-second incident).  Under this set of factual assumptions, the second *Graham* factor weighs in plaintiffs' favor.

The third *Graham* factor, "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight," 490 U.S. at 396, favors neither plaintiff nor defendant.  On the one hand, Mr. Jackson did not come to the apartment's front door when the police identified themselves and shouted his name.  *See* ECF No.28-1 at 1:39.  On the other hand, the interaction was so short that police need not have believed that Mr. Jackson was resisting arrest or defying police orders.

The "reasonableness" inquiry demanded by *Graham* suggests that plaintiffs alleged a constitutional violation.

b. Qualified Immunity: Clearly Established Law

Having found that plaintiffs' complaint alleges a constitutional violation, I turn to whether the law was "clearly established" at the time of the seizure. *Pearson*, 555 U.S. at 232. "For a right to be clearly established there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent." *Mascorro v. Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

In *Allen v. Muskogee*, the Tenth Circuit held that police officers recklessly created the need to use deadly force. *Allen*, 119 F.3d at 841. Officers responding to a report of an armed and suicidal individual found Mr. Terry Allen in his car holding a gun. *Id.* at 839. Three officers moved immediately to the car shouting for Mr. Allen to drop his gun. One tried to open the door, another tried to grab the gun, and a third pinned Mr. Allen's arm. *Id.* When Mr. Allen pointed the gun at the officers, they shot and killed. *Id.* The Tenth Circuit held that a reasonable jury could have found that the officers' actions were reckless and precipitated the need to use deadly force. *Id.* at 841.

In *Sevier v. City of Lawrence*, the Tenth Circuit declined to overturn a denial of qualified immunity when officers engaged a man with a knife in his own home. 60 F.3d at 700. Mr.

Gregory Sevier's parents requested police to come speak with their 22-year-old son, who was having relationship problems. *Id.* at 697. The officers picked the lock on Mr. Gregory's bedroom door and found him holding a butcher knife. *Id.* at 698. The officers repeatedly ordered Mr. Gregory to drop the knife. *Id.* Mr. Gregory ignored their commands. *Id.* A few moments later, he lunged at the officers, who shot him dead. *Id.* The Tenth Circuit affirmed the district court's denial of summary judgement on the qualified immunity defense because the officers may have "precipitated the use of deadly force by their own actions . . . immediately prior to the shooting. *Id.* at 701.

In *Hastings v. Barnes*, 252 F. App'x 197 (2007) (unpublished), the Tenth Circuit upheld denial of qualified immunity to two officers who had shot and killed an emotionally disturbed plaintiff that advanced upon them with a samurai sword. *Id.* at 198. The court found that the officers had "unreasonably escalated the situation to the point deadly force was required" when they entered the plaintiff's home uninvited, "crowded themselves in [the plaintiff's] doorway (leaving no room for escape), [and] issued loud and forceful commands at him." *Id.* at 203. The Tenth Circuit held that, even though deadly force was appropriate at the instant the plaintiff advanced towards the officers with a sword, the officers were not entitled to qualified immunity because of their actions leading up to the shooting. *Id.*

*Allen*, *Sevier*, and *Hastings* collectively establish the wrongfulness of Officer Henderson's conduct as it is described by plaintiffs. Defendants' attempts to distinguish the above cases are unpersuasive. Though the plaintiffs in *Allen*, *Sevier*, and *Hastings* were "in no way potentially holding hostages," ECF No. 39 at 4, the plaintiffs in those cases did potentially pose a danger to the officers and others. Further, the complaint alleges — and I must accept as

true — that Officer Henderson knew Mr. Jackson was not holding hostages when he entered the apartment.  Officer Henderson's lack of "clear visual contact" with Mr. Jackson prior to the shooting, ECF No. 39 at p.3, arguably makes his conduct more egregious, not less.  The officers in *Allen*, *Sevier*, and *Hastings* saw that the plaintiff was armed and dangerous.  Officer Henderson merely guessed as much.  Finally, Tenth Circuit precedent puts no weight on whether a plaintiff is "obviously suicidal."  ECF No. 39 at p.3.  The officers in *Sevier* did not believe they were responding to a suicide call.  *Sevier*, 60 F.3d at 698.

Because plaintiff alleges facts showing that Officer Henderson violated Mr. Jackson's clearly established constitutional rights, his qualified immunity defense fails at this stage of litigation.

### 2.   Officer Liability: Other Officers

Plaintiffs claim the other officers are liable for failing to intervene to prevent deprivation of Mr. Jackson's constitutional rights.  ECF No. 28 at ¶129.  It is "clearly established" that officers have a duty to intervene when they "observe[] or ha[ve] reason to know" of a constitutional violation and have a "realistic opportunity to intervene."  *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir.2008) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994)).  Given that plaintiffs have alleged a constitutional violation, *see supra*, the other officers will not be entitled to qualified immunity if they knew of the violation and had opportunity to intervene.  "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise."  *Id.*

In evaluating whether plaintiffs have met their burden I bear in mind the strict rules requiring I construe the limited facts before me in the light most favorable to plaintiffs. The record viewed in this light leads me to deny qualified immunity at this stage to Officers Orchard, Hannon, and Matthews and to grant qualified immunity to Officer Johnson.

Plaintiffs allege that Officers Orchard, Hannon, and Matthews knew Mr. Jackson was alone when they entered the apartment. ECF No. 28 at 111, 141. This factual claim about the officers' mental state is not "utterly contradicted" by the record before this Court. *Scott*, 550 U.S. at 380. Officer Johnson's BWC footage confirms that she radioed the other officers informing them that Ms. Jackson reported her brother to be alone, unarmed, and possibly suffering from mental health issues. ECF. No. 38-1 at 2:46. The footage does not show whether the other officers had already entered the apartment when they received Officer Johnson's radio report. It is therefore plausible that Officers Orchard, Hannon, and Matthews were informed of Ms. Jackson's statements indicating her brother was not a threat, believed those statements, and nonetheless decided to escalate the situation by entering the apartment.[1]

This factual record, if confirmed through discovery, could show that Officers Orchard, Hannon, and Matthews "observe[d] or ha[d] reason to know" of a constitutional violation. *Vondrak*, 535 F.3d at 1210. The alleged constitutional violation that ended when Officer Henderson shot Mr. Jackson had begun when Officer Henderson unreasonably created the need to use deadly force by entering the apartment with his gun drawn. *See supra*. Officers Orchard,

---

[1] The officers' believing these statements is plausible given Officer Orchard's apparent belief that the 911 call was a prank.

Hannon, and Matthews did more than observe Henderson's unreasonable escalation — they joined him. *See* ECF. No. 28 at ¶56, 64–65, 104, 127.

The record might also show that the three officers "had sufficient time to intercede or [were] capable of preventing the harm." *Vondrak*, 535 F.3d at 1210. An officer's ability to intervene is a factual question for the jury unless no reasonable jury could possibly find in the plaintiff's favor. *Id.*

Plaintiffs assert that the other officers could have intervened by further assessing the situation, gathering additional information, and using de-escalation tactics. ECF No. 28 at ¶56. Plaintiffs seem to imagine the other officers' telling Officer Henderson to holster his weapon and ask Ms. Jackson a few more questions before entering the apartment. Would Officer Henderson have heeded such a request? I cannot say. But I also cannot conclude that, if all officers knew Mr. Jackson was alone and unarmed, no reasonable jury would find that the other officers could have prevented Officer Henderson's entering the apartment and killing Mr. Jackson. [2]

This case is unlike *Savannah v. Collins*, 547 F. App'x 874 (10th Cir. 2013) (unpublished), where the Tenth Circuit found the absence of any indication that an officer could have intervened to prevent a police dog from attacking a handcuffed suspect. *Id.* at 876–77. The court in that case relied on a combination of three facts: First, the officer in question played no part in initiating the unreasonable force because he did not deploy the dog. *Id.* at 876. Second, the plaintiffs did not specify how the officer could have intervened. *Id.* Third, no facts suggested that the officer had sufficient time to intervene. *Id.* at 877 (contrasting cases where an attack

---

[2] A jury might also find a similar duty and ability to intervene if the officers, believing the house to contain hostages, were obligated to gather facts and call a Crisis Response Team before entering the apartment. *See* ECF No. 38-2.

"was over in a matter of seconds," *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 n.3 (1st Cir.1990), with cases where officers had two-to-five minutes in which to intervene.).

None of the three factors supporting the *Savannah* court's conclusion apply here.  First, unlike in *Savannah* where a second officer arrived and "immediately" deployed his dog, the three officers here congregated outside Mr. Jackson's apartment and collectively decided to initiate the encounter by entering with weapons drawn.  Second, plaintiffs here specify alternative actions that the officers could have taken.  ECF No. 28 at ¶ 56–59 (asserting that the officers could have "remain[ed] outside the premises," "[used] the passage of time to diffuse the situation," or "engag[ed] in non-threatening communications).  Third, the encounter took at least three minutes — a timeline that the *Savannah* court indicated is sufficient to intervene.  *See Savannah*, 547 F. App'x at 877; ECF No. 38-1.

For plaintiffs to ultimately prevail in this case, discovery might have to confirm that every minute detail of the encounter on March 4, 2019 unfolded exactly how plaintiffs describe.  Real-world experience tells me this result is unlikely.  But procedural rules require me to assume as much at this stage of litigation.  I therefore deny defendants' motion to dismiss § 1983 claims against Officers Orchard, Hannon, and Matthews.

I reach the opposite conclusion regarding Officer Johnson.  No reasonable jury could conclude that she failed to discharge a duty to intervene.  Plaintiffs wanted the officers to "further assess the situation . . . , information-gather, and engage in de-escalating tactics or other courses of action."  ECF No. 28 at ¶ 56.  Officer Johnson did exactly that.  She calmly and persistently gathered information from Ms. Jackson and informed the other officers of her findings.  Plaintiffs cannot describe an appropriate set of actions and then sue an officer for

following their blueprint to a "t."  I therefore grant defendants' motion and dismiss all claims against Officer Johnson.

### 3.  Municipal Liability

Plaintiffs advance two theories of liability against the City of Aurora.  First, they assert that Aurora's failure to adequately train its officers resulted in the deprivation of Mr. Jackson's constitutional rights.  ECF. No. 28 at ¶79–85.  Second, they claim that Aurora had a custom, practice, or policy condoning use of excessive force.  ECF No. 28 at ¶87.

"[T]he inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  To establish liability, a plaintiff must show "that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for [a constitutional] a violation," and "a direct causal link between the constitutional deprivation and the inadequate training." *Allen*., 119 F.3d 837, 841–42 (10th Cir. 1997).

Plaintiffs have not met their burden here.  The complaint's repeated assertions that Aurora inadequately trained its officers are "mere conclusory statements."  *Iqbal*, 556 U.S. 678. They make no representations about Aurora's training practices or a causal link between those practices and the constitutional deprivation.

Plaintiffs have also failed to state a claim on their policy or custom theory of municipal liability.  To establish § 1983 liability of a municipality for the acts of its employees under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), plaintiffs must "identify 'a government's policy or custom' that caused the injury."  *Schneider v. City of Grand Junction Police Dep't*, 717

F.3d 760, 769 (10th Cir. 2013) (citing and quoting *Monell*, 468 U.S. at 694). A plaintiff must also show "that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Id.* (citing *Bd. of Cnty Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)).

The complaint falls short. Its allegations are conclusory. Plaintiffs provide only a single newspaper article announcing an investigation into the Aurora Police Department for improper patterns and practices. ECF No. 28 at ¶87 n.1. An investigation into possible patterns and practices is not evidence of those practices. The newspaper article does not "nudge[ plaintiffs'] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547.

### C.  **State Law Claims**

Plaintiffs assert two state-law claims against defendant officers: wrongful death and assault and battery. ECF No. 28. Because all parties agree that defendants are public employees under the Colorado Government Immunity Act, plaintiffs may only recover if defendants' conduct was "willful and wanton." C.R.S. § 24-10-118(2)(a) ("A public employee shall be immune from liability in any claim for injury . . . which lies in tort or could lie in tort . . . which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing such injury was willful and wanton . . . .").

At this stage of litigation, however, plaintiffs need only state enough facts to plausibly claim that defendants' conduct was willful and wanton. *See Ridge at Red Hawk,* 493 F.3d at 1177. Defendants tell the Court that public employees act willfully and wantonly when they consciously disregard danger to others in taking certain actions or "purposefully commit[

19

dangerous] conduct . . . , heedlessly and recklessly, without regard to consequences [or] the rights and safety of others".  ECF No. 35 (first citing *Gray v. Univ. of Colo. Hosp. Auth.*, 284 P.3d 191, 198 (Colo. App. 2012), then quoting *Moody v. Ungerer*, 885 P.2d 200, 205 (Colo. 1994)).

Plaintiffs have met this burden for Officers Henderson, Orchard, Hannon, and Matthews.  They allege that these officers knew Mr. Jackson was alone, non-threatening, and suffering from mental health issues.  ECF No. 28.  I explained above how, on the record before the Court, it is plausible that these officers either actively violated Mr. Jackson's constitutional rights or acquiesced to a constitutional violation that they had the power to prevent.  *See supra*.  Such conduct would be "willful and wanton," exposing the officers to liability.  Plaintiffs have therefore stated claims for wrongful death and assault and battery.  Because plaintiffs have stated claims, this Court finds that it has subject matter jurisdiction.

I further find that plaintiffs have not met their burden regarding Officer Johnson.  For substantially the same reasons described above, her conduct was not willful and wanton and the claims against her are dismissed.

## ORDER

Defendants' motion to dismiss claims against the City of Aurora, Colorado is GRANTED.

Defendants' motion to dismiss claims against Officer Bridget Johnson is GRANTED.

Defendants' motion to dismiss claims against Officers Justin Henderson, Keith Mathews, Toney Hannon, and Clark Orchard is DENIED.

DATED this 3rd day of September, 2021.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge