IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 1:20-cv-00618-RBJ

LATARSHA FLORES and
SAMUEL JACKSON, individually and as Representatives of the Estate of Shamikle Jackson,
and as Next Friends of N.J., Successor in Interest,

      Plaintiffs,

v.

JUSTIN HENDERSON, individually,
KEITH MATTHEWS, individually,
TONEY HANNON, individually, and
CLARK ORCHARD, individually,

      Defendants.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

This case involves the killing of Mr. Shamikle Jackson by Aurora police officers. Before the Court is defendants' motion for summary judgment. ECF No. 73. Defendants' motion is DENIED.

### FACTS

Shamikle Jackson ("Mr. Jackson"), the decedent in this case, was a resident of Colorado at the time of his death. He was twenty-two years old. Amended Complaint, ECF No. 28, at ¶ 89. He lived with his sister Shaquayla Jackson ("Ms. Jackson") and her minor child in Aurora at 2210 N. Dallas Street, Apt #2. *Id*. ¶¶ 9, 11. Mr. Jackson spent time with and financially supported his minor daughter, Nova Jackson, who lived in Louisiana. *Id*. ¶ 10. Latarsha Flores

1

and Samuel Jackson ("plaintiffs") are Mr. Jackson's parents.  They resided in Louisiana at all

relevant times.  *Id*. ¶¶ 12-14.  Bridget Johnson[1] and Justin Henderson, Keith Matthews, Toney

Hannon, and Clark Orchard (the "individual defendants") were police officers with the Aurora

Police Department ("APD") at the time of these events.  *Id*. ¶¶ 15-19.

On March 4, 2019 at 8:50 am Mr. Jackson called 911 on his sister's cell phone while

experiencing a mental health crisis.  According to the allegations in the Amended Complaint,

which presents a version of the facts that in several material respects differs from the defendants'

rendition of the facts, about a week before his call, he had been seen at Aurora Mental Health for

evaluation and treatment—a fact known to his sister and other family members.  *Id*. ¶¶ 24-26.

During the six-minute 911 call Mr. Jackson told the dispatcher that he had two hostages, and that

two people were dead.  *Id*. ¶ 28.  The dispatcher did not gather additional information from Mr.

Jackson about any potential mental health disabilities or emotional disturbances.  *Id*. ¶ 29.

Officers Johnson, Matthews, Hannon, and Orchard were dispatched to the scene at

approximately 8:53 am, and Officer Henderson decided himself to respond to the call.  *Id*. ¶¶ 34-

36.  No Crisis Response Team or Crisis Intervention Trained Members were dispatched.  *Id*. ¶

32.  Officers Matthews and Orchard each said that they responded to a call referencing a possible

hostage situation and two people possibly deceased.  Officer Orchard also said during his post-

incident interview that he thought the 911 call was some sort of prank, as APD had received such

calls recently.  *Id*. ¶¶ 36-39.

---

[1] The claims against Officer Johnson have been dismissed, so she is no longer named as an individual defendant.
*See* ECF No. 45.

Case 1:20-cv-00618-RBJ   Document 101   Filed 01/25/23   USDC Colorado   Page 3 of 17

Upon arriving at the scene, the officers proceeded directly to apartment #2.  No one else appeared to be around.  The front door to the apartment was slightly open, and the officers announced their presence.  *Id*. ¶¶ 40-44.  Ms. Jackson came to the door.  The officers asked if there was anyone else inside the apartment, and Ms. Jackson said that she and her brother Shamikle Jackson were the only ones.  *Id*. ¶¶ 45–-7.  Ms. Jackson was removed from the entryway and questioned by Officer Johnson.  Ms. Jackson told Officer Johnson that her brother had possible mental health issues.  *Id*. ¶¶ 50-51.  Officer Johnson radioed the other officers informing them that Ms. Jackson reported that her brother was alone in the apartment, had mental health issues, and was unarmed.  ECF No. 38-1 at 2:46.

Officers Henderson, Matthews, Hannon, and Orchard entered the apartment without pausing to speak with Ms. Jackson.  They did not discover any hostages or injured persons inside.  ECF No. 28 ¶¶ 64-65.  They moved down the hallway yelling for Mr. Jackson to come out of the room at the end of the hall, where Ms. Jackson had told the officers he was.  Officer Henderson had his gun drawn, and other officers may have had weapons drawn as well.  *Id*. ¶¶ 67-69.  Mr. Jackson did not leave the room as the officers instructed.  Drawing reasonable inferences in plaintiffs' favor, the officers entered the bedroom in which Mr. Jackson was located with the information that Mr. Jackson was alone and posed no imminent danger to others.  *See id*. ¶¶ 47-49, 111-12.  Within two minutes of first calling his name, the officers "corner[ed]" Mr. Jackson in his room, Officer Matthews tased Mr. Jackson, and Officer Henderson shot Mr. Jackson multiple times and killed him.  *Id*. ¶¶ 70, 77.

Plaintiffs filed this lawsuit on March 4, 2020, asserting claims for excessive force under Section 1983 and claims for wrongful death and assault and battery under state law. *See*, *generally*, ECF No. 1; ECF No. 28.

## STANDARD OF REVIEW

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Id*. However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

Rather, the nonmoving party must offer "specific facts that would be admissible in evidence in the event of trial, from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Stated differently, the party must provide "significantly probative evidence" supported by materials such as "affidavits, deposition transcripts, or specific exhibits incorporated therein" that would support a verdict in her favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). Where different ultimate inferences may be drawn from the evidence presented by the parties,

substituting "the sterile bareness of summary judgment" for the advantages of trial before a live

jury with live witnesses is not appropriate. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176

(1970) (Black, J., concurring); *see also Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1411

(10th Cir. 1984).

## ANALYSIS

### I.   SECTION 1983 CLAIMS.

Defendants assert that here that summary judgment is appropriate on the Section 1983

claims because they are entitled to qualified immunity.  A Section 1983 defendant's assertion of

qualified immunity is an "affirmative defense [that] creates a presumption that the defendant is

immune from suit." *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir.

2020).  To overcome this presumption, the plaintiff must demonstrate (1) that the defendant's

actions violated a constitutional or statutory right, and (2) that the right was clearly established at

the time of the defendant's alleged misconduct. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th

Cir. 2014).  The plaintiff must make this demonstration "on the facts alleged" and by reference to

evidence in the record. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir.2009).  While the

court need not adopt a version of the facts that is "blatantly contradicted by the record," it must

construe the facts in the light most favorable to the plaintiff as the nonmovant. *Scott v. Harris*,

550 U.S. 372, 378 (2007); *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008).

Whether a right is clearly established for purposes of qualified immunity must be decided

"in light of the specific context of the case, not as a broad general proposition." *Brosseau v.

Haugen*, 543 U.S. 194, 198 (2004) (internal quotations omitted).  "The contours of the right must

be sufficiently clear that a reasonable official would understand that what he is doing violates

that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (internal quotations omitted).  The relevant inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiffs maintains." *Medina v. City & Cnty. of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).

However, it is not necessary for the precise conduct of the defendants to have been previously held unlawful—it is enough if preexisting law gave the defendants fair warning their conduct violated the law.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances" and emphasizing that while "earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding") (internal quotations omitted); *see also Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir.2004) ("[T]he qualified immunity analysis [has shifted] from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional.").  Although alleged rights violations must be analyzed at the proper level of generality, "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce*, 359 F.3d at 1298.

A.  Officer Henderson.

Claims that police used excessive force during a seizure are analyzed under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989).  The

Supreme Court has delineated three factors relevant to the reasonableness inquiry: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Fisher v. City of Las Cruces*, 584 F. 3d 888, 894 (10th Cir. 2009) (quoting *Graham*, 490 U.S. at 396).

Because the Fourth Amendment's reasonableness standard requires that courts evaluate the totality of the circumstances, "conduct that passes constitutional muster in one case may constitute a Fourth Amendment violation in another." *Grass v. Johnson*, 322 F. App'x 586, 589 (10th Cir. 2009) (unpublished). The totality of the circumstances analysis includes assessing whether an officer unnecessarily created the need to use force. *Jiron v. City of Lakewood*, 392 F. 3d 410, 415 (10th Cir. 2004) (quoting *Sevier v. City of Lawrence*, *Kan*., 60 F. 3d 695, 699 (10th Cir. 1995) ("The reasonableness off the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'").

Here, plaintiffs contend that Officer Henderson violated Mr. Jackson's Fourth Amendment rights by unreasonably seizing him after recklessly creating a situation in which deadly force was required. ECF No. 28 ¶¶ 105, 108. Plaintiffs have alleged sufficient facts with support from the record to create a triable issue of fact on this issue under the three-part *Graham* test. *See* 490 U.S. at 395. As I observed at the motion to dismiss stage, the first *Graham* factor—the severity of the crime—weighs in plaintiffs' favor based on the allegations in the complaint and the supporting evidence from Officer Johnson's bodyworn camera transcript. *See*

ECF No. 45 at 8-9.  This is adequate evidence at the summary judgment stage as well.  *See Riggins*, 572 F.3d at 1107.

There is at least some support in the record for plaintiffs' allegations that Officer Henderson approached the bedroom in which Mr. Jackson was barricaded with the information that Mr. Jackson was the only person inside, did not have access to weapons, posed no immediate danger to anyone inside or outside the apartment, and had had recent mental health issues.  *See* ECF No. 38 ¶¶ 111-12; ECF No. 38-1 at 2.  Ms. Jackson met Officer Johnson at the door in no apparent distress and stated that Mr. Jackson was alone inside without access to weapons.  *See* ECF No. 38-1 at 2.  Officer Johnson in turn transmitted that information to the other officers by radio, and the other officers acknowledged receipt.  *See id*. (Officer Orchard responding "copy").  This radio broadcast occurred before Officer Henderson confronted Mr. Jackson or was placed in a position requiring the use of force.  *Compare* ECF No. 78-5 at 12 (radio broadcast occurred 38 seconds before shots were fired) *with* ECF No. 73-2 at 19:6-10 (Officer Henderson describing that one or one-and-a-half seconds elapsed from when the officers opened the door to Mr. Jackson's bedroom and when he shot Mr. Jackson).

Further supporting plaintiffs' contention that the officers knew or reasonably should have known that Mr. Jackson posed no active threat before they confronted Mr. Jackson are the facts that when the officers first entered the apartment, "nothing appeared out of order, there was no evidence of anything unusual, there was no one screaming for help, there were no other telephone calls made to dispatch about this incident, there was no blood anywhere, there were no shots being heard before and/or after their arrival on the scene, and all that was heard was a male-sounding voice telling the officers that they would have to come in and get him."  ECF No.

78-6 at 2.[2]  The officers each admitted in their respective depositions that they saw no signs of
violence or disturbance in the apartment.  *See*, *e.g.*, ECF No. 73-4 at 18 (Officer Orchard
answering affirmatively that "he realized that there was no evidence of anybody having been
injured in the apartment," that "nobody was crying out for help," and that he "never heard any
gunshots or any noises from inside that back bedroom to indicate anybody was being held or
injured or anything of that sort"); *see also see also* ECF No. 73-2 at 18:17-24 (Officer Henderson
enumerating an exhaustive list of the factors he considered in proceeding with entering the
apartment and confronting Mr. Jackson, which did not include any observations of disturbance or
people in danger).

        In fact, two of the officers (Orchard and Henderson) testified that they believed the 911
call was a prank "swatting" call, due to the unusual time and day (Monday morning at 8:30) and
the disparity between the criminal activity reported in the call and the peaceful scene on arrival.
*See*, *e.g.*, ECF No. 73-4 at 4:9-20 (Officer Orchard testifying that he thought the call was a
"bogus call to try to elicit a massive police response" because it occurred on a Monday morning
and its content "just seemed so outlandish").  Officer Orchard affirmed in his deposition that in
22 years of service he had "never heard [a call] like it."  *Id*. at 4:17, 20.  Drawing inferences in

---

[2] Contrary to defendants' argument, the fact that plaintiffs' response to the motion for summary judgment
cites to this characterization of the facts from the report of plaintiffs' expert Dan Montgomery has no
bearing on the existence or relevance of those underlying facts.  *See* ECF No. 83 at 9 (citing *Clark v.
Colbert*, 2017 U.S. Dist. LEXIS 110972, *18 (E.D. Okla. 2017) for the proposition that it is improper for
plaintiffs to rest an opposition to summary judgment solely on an expert's legal conclusions as to
reasonableness).  The mere fact that this amalgamation of facts appears in an expert's report does not
disable the court from crediting this portrayal, particularly since these facts are neither disputed by
defendants nor contradicted by other evidence in the record (defendants dispute only the conclusions in
Mr. Montgomery's report).  *See* ECF No. 83 at 9; *see also Scott*, 550 U.S. at 378 (noting that courts may
on summary judgment disregard plaintiffs' characterizations of the facts only if those allegations are
"blatantly contradicted" by objective evidence in the record, such as video footage).

plaintiffs' favor as required at this stage, this testimony would tend to suggest that Officer

Henderson would have been similarly aware that the call was unusual, and a jury could conclude

that a reasonable officer would have tailored his response to account for that peculiarity, perhaps

by seeking additional information before treating the call as a multiple-homicide-multiple-

hostage situation and moving in with maximum force and haste.  *See York*, 523 F.3d at 1210.

As I noted on the order denying defendants' motion to dismiss, if Officer Henderson

knew that Mr. Jackson was alone and probably did not have weapons (and if officers believed

that the call was a prank), then the "crime at issue" would have been only false reporting of an

emergency to authorities, a class 3 misdemeanor. COLO. REV. STAT. §18-8-111 (2018).  When

the severity of the crime is a misdemeanor, the first *Graham* factor "weighs against an officer's

use of force." *Bond v. City of Tahlequah, Okla.*, 981 F.3d 808, 819 (10th Cir. 2020).  Here,

plaintiffs have alleged specific facts with support in the bodyworn camera footage and deposition

testimony to create a genuine dispute that the use of force was unreasonable under the first prong

of the *Graham* test.

The second *Graham* factor, "whether the suspect pose[ed] an immediate threat to the safety of

the officers or others," likewise weighs in plaintiffs' favor viewing the facts and evidence in the

light most favorable to plaintiffs.  *See* 490 U.S. at 396; see also *Pauly v. White*, 874 F.3d 1197,

1216 (10th Cir. 2017) (noting that the second prong is the most important to a Fourth

Amendment analysis).  Plaintiffs concede that once the situation inside the apartment had already

escalated, "[n]o force could reasonably have been used to get the situation under control rather

than deployment of multiple gunshots and a taser."  ECF No. 28 ¶ 78.  They argue, however, that

Officer Henderson's "reckless" and "unreasonable conduct immediately preceding the shooting

wrongfully provoked the need for deadly force." *Id.* ¶¶ 107-08. The Tenth Circuit recognizes that "[t]he reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably 'created the need to use such force.'" *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004) (quoting *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995). If an officer's use of deadly force—even against a threat of imminent death or great bodily injury—was precipitated by and "immediately connected" to the officer's own reckless conduct, then that use of deadly force is unreasonable. *See Pauly*, 874 F.3d at 1220-21 (citing *Allen*, 119 F.3d at 837).

Here, less than two minutes passed from when the officers first called Mr. Jackson's name to when Officer Henderson shot and killed him. Several officers entered the apartment before they gathered any information from Ms. Jackson, who met them at the door and was by all descriptions a calm and cooperative bystander with potentially valuable information as a resident of the premises and family member of the individual being pursued. *See* ECF No. 73-2 at 17:7-12, 24-35 (Officer Henderson admitting that he could have paused to ask Ms. Jackson "whether or not there were any dead people inside the apartment" or obtain other information from her but did not "because it wouldn't have been effective communication").

Although Officers Hannon and Matthews were both on scene and certified in crisis de-escalation techniques, the officers did not employ strategies such as covering and retreating, asking Mr. Jackson for more information about the supposed hostages, negotiating, or arming themselves with less-lethal alternative modes of force (such as a beanbag shotgun, 40-mm launcher, or police canine). *See* ECF No. 78-5 at 2-3 (listing alternative less lethal modes of

force); *see also* ECF No. 73-4 at 17 (plaintiffs' counsel asking Officer Orchard whether it was true that "one of the tactics that you could have used was to try to ascertain more information about those supposed hostages and dead people"); ECF No. 73-3 at 14: 7-9, 17-20 (Officer Matthews affirming that when he first saw Mr. Jackson he did not "make any announcements or say anything to him" and that none of the officers behind Officer Matthews "sa[id] or verbalize[d] anything [to Mr. Jackson] at that point").

A reasonable jury could find that advancing rapidly toward the room in which Mr. Jackson was sheltering without saying anything other than a single command to "come on out" (such as explaining that there were police officers in the home, further encouraging Mr. Jackson to come out of the bedroom, or asking for more information about the presence of others in the bedroom) unreasonably precipitated the situation in which the officers then needed to use deadly force.  ECF No. 73-4 at 13:3-4.  Use of deadly force less than two minutes after first calling Mr. Jackson's name is "immediately connected" to Officer Henderson's entering the apartment with weapons drawn.  *See Pauly*, 874 F.3d at 1205 (finding that police shooting at a suspect less than five minutes after arriving on the scene was "immediately connected" to police conduct in the same episode); *Allen*, 119 F.3d at 841 (finding the same for a ninety-second incident).  Given the facts alleged and the timeline reflected in the bodyworn camera footage and the officers' testimony, plaintiffs have created a triable issue of fact as to whether the officers' failing to employ de-escalation tactics to mitigate the risk of provoking a threat of deadly force against them was reckless under the second *Graham* prong.

The third *Graham* factor, "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight," favors neither plaintiff nor defendant on the available evidence.  *See*

ECF No. 45 at 11 (citing 490 U.S. at 396).  On the one hand, Mr. Jackson did not come to the apartment's front door when the police first identified themselves and shouted his name.  *See* ECF No. 28-1 at 1:39.  On the other hand, the interaction was so short that police need not have believed that Mr. Jackson was resisting arrest or defying police orders.  *See* ECF No. 45 at 11.

There is no direct evidentiary support for defendants' allegation that Mr. Jackson "laid in wait" for officers to "get close enough to try to kill them," and it would be inappropriate to draw this inference at the summary judgment stage.  *Cf.* ECF No. 73 at 17.  Moreover, even if Mr. Jackson's failure to obey "multiple commands to come out" over a period of one to two minutes could constitute resisting arrest within the meaning of the third *Graham* prong, it stretches the bounds of reason to imply that failure to come out immediately could justify the use of deadly force, particularly when defendants concede that Mr. Jackson was making no attempt to flee and, by all appearances, there was no one else in the apartment or its immediate vicinity who could be harmed if Mr. Jackson were not immediately restrained.  *See id*.

The evidence in the record and reasonable inferences therefrom at least permit a finding that Officer Henderson's use of force was unreasonable under the Fourth Amendment.  As I explained in the order on defendant's motion to dismiss, the wrongfulness of the alleged conduct was clearly established at the time of the seizure.  *See* ECF No. 45 at 12-13 (citing *Allen*, 119 F.3d at 841; *Sevier*, 60 F.3d at 700; *Hastings v. Barnes*, 252 F. App'x 197 (2007) (unpublished)). Plaintiffs have provided evidence to support the allegations on which I relied in analogizing to those cases in which qualified immunity was properly denied—such as the fact that the officers believed Mr. Jackson was not holding hostages when they entered his bedroom and the fact that the officers had been told Mr. Jackson was not "armed and dangerous."  *See* ECF No. 73-4 at 18;

13

ECF No. 38-1 at 2.  Because plaintiffs have created a triable issue as to the unreasonableness of Officer Henderson's conduct under clearly established law, summary judgment in defendants' favor on this claim is inappropriate.

   B.  Officers Orchard, Hannon, and Matthews

   Likewise, plaintiffs allege with factual support that the other officers "are liable for failing to intervene to prevent deprivation of Mr. Jackson's constitutional rights."  ECF No. 28 ¶ 129.  It is clearly established that officers have a duty to intervene when they "observe[] or ha[ve] reason to know" of a constitutional violation and have a "realistic opportunity to intervene." *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir.2008) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994)).  Given that plaintiffs have withstood summary judgment on a constitutional violation, *see supra*, the other officers will not be entitled to qualified immunity if they knew of the violation and had opportunity to intervene.  *See Vondrak*, 535 F.3d at 1210 ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

   Plaintiffs contend that Officers Orchard, Hannon, and Matthews knew that Mr. Jackson was alone when they entered the apartment.  This allegation is supported by Officer Johnson's bodyworn camera footage, which shows that she radioed the other officers informing them that Ms. Jackson reported that her brother was alone and unarmed, at least before the officers initiated the confrontation with Mr. Jackson (even if it is not clear whether the officers had that information when they first entered the apartment).  *See* ECF No. 28 ¶¶ 64-66 (noting that just 38

seconds elapsed from Officer Johnson's conveyance of that information to when Officer

Henderson shot Mr. Jackson).  Because the officers conducted a search of multiple other rooms

in the first-floor hallway before reaching Mr. Jackson's bedroom at the end of the hallway, and a

search of multiple rooms plausibly might require more than 38 seconds, an inference can

reasonably be drawn that the officers did know that Officer Johnson conveyed on the radio when

they approached Mr. Jackson in the back bedroom.  *See id*.

Moreover, at this stage, the court must still draw all reasonable inference in plaintiffs'

favor.  *See Allen*, 119 F.3d at 839.  The inference that the officers knew or suspected that there

were no hostages and that it was not an "active shooter" situation is supported by independent

evidence in the record, such as the facts that the officers suspected that the call was a prank and

that there was no visible or audible indication of a disturbance when they arrived on scene.  *See*

ECF No. 73-4 at 12-13 (citing depositions of Officers Orchard and Henderson).

The other requirement for a failure to intervene claim is that defendant *could have*

intervened but failed to do so.  *Cf. Savannah v. Collins*, 547 F. App'x 874, 877 (10th Cir. 2013)

(unpublished) (holding that a failure to intervene claim was not viable because no time elapsed

between the bystander officers' opportunity to intervene arising and the constitutional

misconduct occurring).  Here, by contrast, plaintiffs provide adequate evidence to raise a triable

issue that Officers Henderson, Orchard, Hannon, and Matthews had sufficient time to intervene

and nevertheless failed to do so.  *See id*. at 877 (citing *Priester v. City of Riviera Beach,* 208 F.3d

919, 925 (11th Cir. 2000) for the proposition that two minutes was sufficient time for an officer

to intervene and order another officer to restrain a police dog)).  Plaintiffs allege that two

minutes elapsed from when the officers called Mr. Jackson's name to when Officer Henderson

shot him; more than a few minutes elapsed from when the officers arrived on scene to when the shooting occurred.  Moreover, plaintiffs demonstrate that the officers did not propose to delay entry into the apartment and did not attempt to contact a Crisis Response Team for backup or guidance.  *See* ECF No. 73-4 at 18.  A reasonable jury could find that these failures constituted violations of a legal duty to intervene.  *See* ECF No. 45 at 16.

Because the duty to intervene to prevent a violation is clearly established, and plaintiffs have created a triable fact issue as to whether the officers knew a constitutional violation was occurring with sufficient time to intervene (and not only failed to intervene but also participated in that violation), summary judgment for defendants on these claims is inappropriate.

## II.        STATE LAW CLAIMS.

Plaintiffs assert two state-law claims against defendant officers: assault and battery.  *See* ECF No. 28.  Because all parties agree that defendants are public employees under the Colorado Government Immunity Act, plaintiffs may recover only if defendants' conduct was "willful and wanton."  C.R.S. § 24-10-118(2)(a) ("A public employee shall be immune from liability in any claim for injury…which lies in tort or could lie in tort…which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing such injury was willful and wanton….").  The parties also agree that public employees act willfully and wantonly when they consciously disregard danger to others in taking certain actions or "purposefully commit [dangerous] conduct…heedlessly and recklessly, without regard to consequences [or] the rights and safety of others." *See* ECF No. 35 (citing *Gray v. Univ. of Colo. Hosp. Auth.*, 284 P.3d 191, 198 (Colo. App. 2012) and *Moody v. Ungerer*, 885 P.2d 200, 205 (Colo. 1994)).

As discussed in the *Graham* analysis, *supra*, plaintiffs have alleged with support from the evidence that Officer Henderson's conduct recklessly created the need to use lethal force against Mr. Jackson.  This same conduct could satisfy the standard for a finding of willful and wanton conduct—committing dangerous conduct recklessly and/or consciously disregarding danger to others when acting.  *See Gray*, 284 P.3d at 198.  Likewise, plaintiffs have established a triable issue as to the willfulness or wantonness of the conduct of Officers Henderson, Orchard, Hannon, and Matthews.  They allege with support from discovery and associated inferences that these officers had been informed that Mr. Jackson was alone, non-threatening, and suffering from mental health issues.  *See* ECF No. 45 at 20.  Under the analysis set forth in Section I.2, *supra*, plaintiffs have provided sufficient evidence to support a reasonable conclusion that the officers' failure to gather additional information or use de-escalation techniques and their rapid entry into the apartment with lethal force constituted "conscious disregard" for Mr. Jackson's safety and constitutional rights, which would permit the finding that the officers violated state law.  Therefore, summary judgment on these claims is denied.

## ORDER

For the reasons stated above, defendant's motion for summary judgment at ECF No. 73 is DENIED.

DATED this 25th day of January, 2023.

BY THE COURT:

_____
R. Brooke Jackson

Senior United States District Judge

17